May it please the court, my name is Raymond Aver, A-V-E-R, I represent the appellant, First Intercontinental Bank. I'm going to, I've asked for ten minutes and to reserve five for rebuttal. This court has a choice, it can dig into this and really take a look at what happened here, or it can throw up its hands and say, you know, we'll agree with the BAP, it's constitutionally moot, let's just move on. I've been a bankruptcy lawyer for many, many years. I've represented creditors' committees, I've represented debtors, I've been on creditors' committees, and one thing about the bankruptcy system that good bankruptcy lawyers say is we want to make sure that it's transparent. We want to make sure that everything's above board, that everyone, that everything can be seen and that it's subject to scrutiny. In this particular case, what we have here is we have a settlement between a debtor's husband and wife and their daughters and a sister, sister-in-law. It require, when you have that kind of a settlement and you have a 9019 motion, a compromise motion, it requires more than just scrutiny under the ANC properties test. It requires strict scrutiny, okay? And when you take a look at the bankruptcy, and I'm not going to dwell too much on this, I'm really going to get into mootness, but when you take a look at what the bankruptcy judge did, and in fairness to the bankruptcy judge, because the first judge recused herself and the second judge was kind of thrown into this at the last moment, she didn't have a lot of time. What she did was she prepared a very, very lengthy tentative ruling, no question about its length, but what she didn't do was she didn't dig in. She didn't dig in and she didn't scrutinize it very, very carefully. And then what happened was we had a creditor's committee. And we had a creditor's committee that was acting in a rogue capacity. And if you're a bankruptcy lawyer, you understand that creditor's committees are designed to represent the interests of all unsecured creditors and that a committee is made up of various of the unsecured creditor body. And in essence, as the creditor's committee attorney, you take your direction from the committee. You canvass the issues with the committee. The committee votes. It's supposed to be a very democratic process. What happened here, though, was that the creditor's committee just went out. According to the debtor's council, debtor's council says, we've got a conflict. We represent the husband and wife. We can't enter into a settlement with the children. We need the committee. Well, that's all fine and good. And the committee gets in there and starts investigating. But what the committee doesn't do, committee's council, is it doesn't report to the committee. It doesn't inform the committee about what's going on. It's as if you have a client and you're just completely ignoring that client, whether for the good or for the bad. You don't let them know what you're doing. And then you don't let them know that you're fashioning an agreement. And you don't let them know that you're the proponent of the agreement. And then what happens is the hearing takes place. All of the large unsecured creditors say, no, we don't want this settlement. And one of the four factors, of course, in ANC properties is a deference to the reasonable views of creditors. And the court, again, a lengthy tentative ruling, but not a lot of in-depth analysis as to, really, what's going on here? Is this committee council acting in a rogue capacity? How does this affect the settlement? And the bottom line is, is the settlement did nothing for unsecured creditors because, as we know, this estate is administratively insolvent. Now let's get to mootness, please, because obviously this is fundamental to this court. Constitutional and the BAP, in the BAP's ruling, in a very, very short ruling, says the appeal is constitutionally moot. And why is the appeal constitutionally moot? Because the settlement amount, the $200,000 that the daughters paid for the release of these fraudulent transfer claims and other things, it's been disbursed. We can't do anything about it. We can't unscramble the egg. Well, I would respectfully disagree with the BAP, and I would say that it's not impossible to unscramble the egg. Right, so what would you have the court do to unscramble the egg? Okay. What I would have the court do would be that the $200,000, that the settlement is undone, essentially, and that the bank, my client, be allowed to essentially overbid, as if this was a sale, which a compromise is in a lot of ways. And the bank will overbid. The bank will, A, pay more than the $200,000, and, B, will give the estate a percentage of any recovery. That's what the bank has agreed to do in papers filed before the court. Hasn't the statute of limitations run? Okay, so I'm getting to that. Okay. But I'll address that right now, and then I'll segue back.  And the BAP was very clear in its ruling by saying that, you know, to equitably toll the statute of limitations, even under the facts of this case, would be very, very difficult, if not impossible. And that's why this is constitutionally moot. But we have, but what we're relying on is not 546. What we're relying on is not 548. What we're relying on is not 550. What we're relying on is California law, 3439. Before this bankruptcy case was filed, all of the unsecured creditors had standing to bring fraudulent transfer case. The bank, being one of the largest unsecured creditors, certainly had standing to do that. Since the statute of limitations has expired under 546, the trustee cannot, absent equitable tolling, go back in there and bring these claims. But 3439 is still out there. And the bank can, and the bank, it's, you know, between four to seven years from discovery. And so what would happen is, and to Judge Wardlaw's question, what would happen would be the settlement would be undone, the bank would pay the additional monies, and the bank would be able to pursue the daughters and the sister-sister-in-law under California state law. Not in bankruptcy court. They would have to go into state court to pursue them. Now, is it impossible to undo the settlement, Judge Wardlaw? No, it's not impossible to undo the settlement. And the reason that it's not impossible is because it's the money that has transferred and the money can be given back. In Appellee's brief, they cite the law. But you're saying that in lieu of obtaining the money back from the people to whom it was paid, that is the 200,000, that the bank would pay that? What I'm saying is, is that instead of the $200,000 that was received from the daughters, Right. releasing these claims, the bank is going to pay the 250,000. Right. So there would be no recovery from the people to whom that 200,000 was paid, lawyers and other people? There would need to be at least partial recovery from some of those other people. Why partial? Well, I don't know the exact. The problem is we don't know the exact dollar amounts. Right. Okay? But based upon what I can tell from this record, the vast majority of that $200,000 is in one of two places. It's in a reserve, because if you take a look at the fee applications, they say that $160,000 is going to go into a reserve. And so the money is either in the reserve. Remember, this case has now been converted to Chapter 7. Right. So that would be under the auspices of the Chapter 7 trustee. So I don't know how much of that $160,000 is left, but to the extent any of it is, that could be applied. If not, then you would go get the money from the very professionals whose conduct resulted in this, the creditors' committee whose fee application was in the range of about $600,000. That's been paid? Not all of it has been paid, because, again, this estate is administratively insolvent. Right. But my understanding is a good portion has been. And so now if you look at the brief of the Appellees, they cite to the Lockmiller Industries case, and they say, there is no mechanism by which the trustee or any other party can recover the estate's expenditure or the settlement funds to third parties, including Chapter 11 administrative professionals. That's their brief at page 10. Please read the Lockmiller Industries case. Not only read the Lockmiller Industries case, but read the Ninth Circuit's decision in Endy which discusses the Lockmiller case. There is no question that those monies can be brought back from professionals. What happens not unoften in bankruptcy cases is in Chapter 11 you have your administrative claimants. They get some payments. The case gets converted to 7. And now under the priority scheme in the Bankruptcy Code of 507, the Chapter 7 administrative claims trump the Chapter 11 claims. And so what the Chapter 7 trustee can do is he can bring that money back in from the payments to the Chapter 11 professionals, pay the Chapter 7 administrative claims that are allowed by the court, and then redistribute, if there are any monies left over, to the Chapter 11 claimants. Because in essence they're subordinated to the Chapter 7 estate. What Lockmiller says is you can't bring payments back in from ordinary trade, from trade creditors where the payments were made in the ordinary course of business. Why? Because we want to protect the commerce and so on and so forth. But professionals in a Chapter 11 case understand that there is a risk, in some instances remote, but in other instances not, where their fees would have to, they would have to disgorge all or a portion of their fees in the event of a conversion to Chapter 7. So it is possible to fashion relief. The appellees in their brief also cite to the Dykstra case. It's an unpublished opinion. It's an opinion by Judge Mund who I find just a tremendous judge. At any rate, if you put our case against the Dykstra case, you're going to see, and they say in their brief that this is a similar case. They say in Dykstra the BAP determined that an appeal was equitably moot under factual circumstances similar to the case at Barr. But if you read Dykstra, it involved multiple settlements contingent upon one another. The payments were made, just like in this case they were, but they were, and some of them to administrative claimants, and, but like I said, they were contingent upon one another. The banks who were involved in this settlement went and foreclosed based upon the approval of the settlement. So a lot of things happened that could not be put back together. In this particular situation, we're dealing with money, and that can be put back together, and that's why relief in this case is possible. You only get to constitutional mootness if it's impossible to grant effective relief. But we have set forth in our brief. What about equitable mootness? What about equitable mootness? You're talking? Okay, equitable mootness. Right. Okay, so equitable mootness. First, did you fully pursue your ability to get a stay? We couldn't have done anything more. You couldn't have asked for a stay in the Ninth Circuit? We asked for a stay from the bankruptcy court. The Ninth Circuit? We asked for a stay from the BAP. And what about the Ninth Circuit? We didn't ask for a stay from the Ninth Circuit. Okay. Okay? So we did aggressively pursue our rights under the first prong of the equitable mootness test. I've talked about we asked for a stay. Did you withdraw your motion for a stay of the settlement in front of the bankruptcy court? No. I think what happened was we were being threatened with sanctions, and so we filed a motion for reconsideration of the bankruptcy court's 9019 order. That was denied. We sought a stay. That was denied. We then went to the BAP, and we sought a stay from the BAP, and that was summarily denied in a one-sentence denial. And that's, I think, where we stopped. We didn't pursue after that. But we did aggressively seek a stay. You can look it up later. You're down to one minute and a half, about a minute and a half. Okay. I will reserve my time for rebuttal. All right. Thank you. Thank you. Your Honors, may it please the Court. I'm only going to touch on the underlying litigation, the compromise motion, and the bankruptcy court's resolution of that compromise motion briefly, because I don't necessarily think it's very relevant to this appeal. I think this appeal needs to be decided on mootness. However, I'd like to address some statements that were made by opposing counsel questioning the transparency of the underlying settlement and the bankruptcy court's ruling on that settlement. The record clearly demonstrates that the underlying settlement was negotiated by committee counsel, an independent third party. The debtors did not become involved with the settlement negotiations until the settlement was essentially already fully negotiated, at which point the debtors came in, filed the motion along with the committee, and sought approval of the settlement with the court. The settlement motion was fully briefed. There were oppositions filed. Of course, there were joinders to those oppositions that were essentially one-line joinders that essentially said, we join in appellant's opposition, nothing more than that. And there's no evidence that the committee went entirely rogue, as appellant would suggest. In fact, appellant's own record, the tentative ruling at pages 229 and 230, the tentative ruling in the bankruptcy court indicates that the court addressed appellant's argument that the committee went rogue, and that the bankruptcy court addressed that issue. And in response to that argument, the committee argued that FIB, the appellant, was apprised of the settlement prior to the motion, and the court took these factors into consideration in making its ruling and issuing a 14-page tentative addressing all of the ANC factors with respect to the 1919 motion. With that being said, and back to the issue of mootness, one of the fundamental issues here is whether or not the statute of limitations have been blown, which it's our position that they have been. Appellant has no standing to prosecute these claims. And normally, under normal circumstances, where the ---- What about the California statute? Including those claims, Your Honor, and I'll explain to you why. Because under normal circumstances, the creditors come in before a settlement has been reached, before claims have been released. Under this situation, Your Honor, this settlement has been fully consummated. Claims and adversary proceedings have been dismissed with prejudice. These claims are no longer out there for appellant to essentially assume or be assigned because they've been settled completely. And binding releases have been issued by parties. The claims, in fact, don't exist anymore. So I'm not sure that this Court could do anything to confirm ---- to confer standing on appellant at this point in time. But not only have the claims been settled, and not only have these claims been released and actions been dismissed with prejudice, but there's also the issue of the funds and the recovery of the funds. Appellant suggests that it's easy to just go around recovering funds from these third parties, some of which, actually all of which, are not even involved in this appeal and would be adversely affected third parties who aren't even here or have the opportunity to argue. But it's more than just the administrative claims in this case. The record establishes that taxing agencies have been paid. The record establishes that the United States trustee has been paid. And the record establishes that professionals, Chapter 11 professionals, have been paid pursuant to valid court orders. This is not a situation where, you know ---- So are those the principal places where the funds have been dispersed to the county and state for taxes, the U.S. trustee and the attorneys? Your Honor, we don't have an exact amount of what funds have gone where. It's my understanding that the trustee is currently holding approximately $100,000. What portion of those funds actually came into the estate as a result of this settlement is entirely unclear. But he's holding approximately $100,000. I would assume that the majority of that came in pursuant to the settlement simply because I don't think there were other substantial recoveries in this case. However, a lot of those funds have gone out. Actually, there were other substantial recoveries in this case, and a certain portion of the admin claims have been paid throughout the entirety of this case. And so it is entirely unclear what portion of the funds that the trustee is holding actually came in as a result of the settlement. So it's essentially near impossible to unscramble the egg at this point. And even if the egg were unscrambled, it's entirely unclear, and it's our position that a pellant wouldn't even have standing to prosecute these claims that no longer even exist. So is the estate insolvent? That word's been bandied about. When taking into account outstanding Chapter 11 administrative fees, yes. The Chapter 11 professionals are owed substantially more than what the trustee is currently holding. So the answer to that is yes. Back briefly to the issue of mootness. The arguments that a pellant makes are very, very, very speculative at this point as to whether or not unscrambling the egg today by this Court would result in a pellant being able to essentially just go back into state court and start litigating these claims. Because first you have the issue of standing that I addressed before. Essentially these claims just no longer exist. But then you have the issue of, and a pellant readily admits this, a pellant has to go back into the bankruptcy court and seek relief from the automatic stay in order to prosecute these claims in the state court. And there's no guarantee that an order is going to be entered granting relief from the automatic stay. That issue is going to be heavily litigated. It's not going to go unopposed. It's going to be heavily litigated. There are going to be several parties in interest who chime in with respect to that motion. And I'd say the chances are probably substantially less than average that that motion would even be granted. Because even if it were granted, a pellant doesn't have standing to prosecute these claims in the state court. It's not going to go unopposed to equitable and constitutional mootness. And there was actually a case cited in a pellant's brief. A case by the name of, it's a Tenth Circuit case, Race v. Hagman. And I just wanted to briefly touch on that case. And it relates, instead of to the issue of equitable mootness, back to the issue of the 1919 motion and the compromise, back to the underlying merits, which I said I was only going to touch on briefly, and I don't want to focus too much on that, because I don't think that's an issue here. I think this is all decided on the issue of equitable and unconstitutional mootness. But in that case in particular, a pellant cites that case for the proposition that when there's a creditor, and it relates specifically to the complexity of the litigation ANC factor, where there's a creditor that is willing to basically take on the litigation at no charge to the estate, and that essentially the only one that stands to benefit, or the only ones, I should say, are creditors because the estate's not going to incur any fees, that essentially there's a per se rule that the creditor should be assigned the claims, and that any objecting creditor should have the opportunity to litigate these claims. Well, subsequent case laws made it clear that there is no such per se rule in the Tenth Circuit, and definitely none that I'm aware of in the Ninth Circuit, and I just wanted to bring that to the Court's attention just in case the Court was going to be in any way influenced by that case. Other than that, I do not have any more, unless the panel has any questions of me. Thank you, Counselor. Okay. Counsel's made a lot of statements, and I'm going to try and address them. I'm also going to try and address equitable mootness. Counsel says there's no evidence that the committee was entirely acting in a rogue capacity. I would ask the Court to, again, please review the opposition to the compromise motion. It is in Volume 1 of our excerpts of record. It is at tab number 2, and in it you have the declaration of Young Lim. Mr. Lim represented the bank on the committee. Mr. Lim also happened to have represented another committee member, so he represented two of the committee members. And Mr. Lim's declaration, which is uncontroverted, says that I was on the committee, I fully participated, the committee was never apprised that the committee counsel was doing this, the committee was never given an opportunity to express its views as to this, et cetera, et cetera. I mean, this is very troublesome. If you allow, I don't know, Your Honors, I mean, it's almost as if, I'd like to analogize it, and maybe this is bad, to a personal injury claim where you represent someone and you enter into settlement negotiations and you don't tell them and you settle it and you go in and you get court approval of the settlement and then you go back to your client and you say, well, that's it. And it's even worse than that, because as counsel has admitted, this case is administratively insolvent, and so therefore you go back to your client and you say, I'm sorry, I settled it, I got enough to pay me part of my fees, but you're not going to get anything, but I feel really bad for you. It just smells, it doesn't smell good, and it's not the transparency that the bankruptcy requires. What about the argument that the people who have been paid money are not here in this case to argue their position? The taxing, if you take a look at the settlement agreement itself, there was about $300,000 or so, $100,000 that were being held for the daughters by debtors' counsel from other settlements that had been achieved in the case. The $200,000 of that $300,000 was used to fund this settlement. Not of the full $100,000, and my numbers are a little bit off, but not the full $100,000 went back to the daughters. Why? Because tax claims were paid not out of the $200,000, but out of the $300,000 and some odd $100,000. Those tax claims were paid for the Winnetka property, which was awarded to the daughters as a result of this settlement, and it was paid for the property in San Diego County, the automobile office park. And so, yes, the taxing authorities are not before the Court. With regard to the U.S. trustee, they have notice of this. Do we have a mechanism for getting money back from a taxing authority? I don't think you need to get money back from the taxing authority. I think that's a red herring. I mean, no matter how this would play out, the taxing authority is going to have to be paid. Well, you want the $200,000 to be paid out of the state, returned, and you want the settlement unwound, right? The settlement should be unwound, that's right. And like I said, if the trustee is sitting on, counsel says $100,000, well, let's accept that number. Whatever the amount of the $200,000 that was paid to the taxing authorities, which I don't know how much it was, but the bank is going to put the $250,000 in, so you've got now $350,000. I mean, the $250,000 will cover whatever that was. To the extent there's a shortfall, again, it's not going to come out of the taxing authorities. The U.S. trustee, it won't come out of the U.S. trustee's pocket either. What did the U.S. trustee get? It got quarterly fees. How much could the quarterly fees be in this case? I don't know, $325,000, $650,000, $1,200,000? That's de minimis. The parties that are not here today, that counsel says are not privy to this appeal, have notice of this appeal, and they could have participated. Who are they? Committee counsel and debtor's counsel. And they knew about this from day one. Counsel says, well, the claims have been dismissed, and so, you know, there's prejudice there. Whose claims? It's the aunt daughter's claims. And they've had notice of this thing from the very beginning. They've known what has gone on. So by undoing that portion, again, I think the case law would support that. So I think, again, it is not impossible by any stretch of the imagination to grant effective relief. Counsel says the claims are speculative. Well, we addressed that issue in connection with the 9019 settlement, and if they are or they aren't, that's on the bank. The bank is willing to pursue these claims at no cost to the estate. The estate only benefits. Unsecured creditors only benefit. If the bank is successful in this fraudulent transfer litigation and they bring in money, 20 percent of the net recovery would go to the bankruptcy estate. How does that work? That's just your representation of what the bank would do. You're trying to negotiate a deal. It is in the record, Your Honor. You don't have to look for it now. You can submit it later because you're well over your time. Well, I'm at 4.42, but let me at least... No, you're well over your time, Counsel, and I'm going to ask you to sit down in a minute. So don't waste your time finding the record. It's in the record, Your Honor. It's in the Declaration of Ed Briscoe, and it's in the record. Thank you very much.
judges: Wardlaw, Bybee, Bartle